**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: May 1 2017

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 16-30782 |
| | ) | |
| Ronald Wilson, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 16-3068 |
| | ) | |
| Erik J. Norton, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Ronald Wilson, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding is before the court for decision after trial on Plaintiff's complaint to determine dischargeability of a debt owed to him by Defendant, the debtor in the underlying Chapter 7 case.[1] Plaintiff's complaint is based upon a state court judgment debt arising from construction on his property of a pole barn, which was not finished, after Plaintiff paid $23,000.00 down on the project. Plaintiff alleges that the judgment debt owed to him by Defendant should be excepted from discharge under 11 U.S.C.

---

[1] Plaintiff's complaint also named as a defendant SR Property Improvement Services, LLC. On September 16, 2016, the parties dismissed SR Property Improvement Services, LLC as a party to the complaint by stipulation. [Doc. # 16, p. 2].

§ 523(a)(2) and (a)(4).

The district court has jurisdiction over Defendant's underlying Chapter 7 bankruptcy case as a case under Title 11 and over all proceedings arising in or related to that case, including this adversary proceeding. 28 U.S.C. § 1334(a), (b). The Chapter 7 case and all proceedings arising in or related to that case, including this adversary proceeding, have been referred to this court for decision. 28 U.S.C. § 157(a) and General Order No. 2012-07 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of particular debts are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Defendant is entitled to judgment in his favor on the complaint.

## FINDINGS OF FACT

Defendant was an owner of SR Property Improvement Services LLC dba SR Services. After seeing a contractor flyer for SR Services displayed at Menards, which states that SR Services is an "A" rated company by the Better Business Bureau, [*see* Pl. Ex. 15], Plaintiff contacted Defendant regarding construction of a pole barn on Plaintiff's residential property in Margaretta Township. Defendant provided Plaintiff a quote for construction of a 60x40x15.5 foot pole barn in the amount of $39,266.61. [Pl. Ex. 10]. The quote states that a $23,000.00 deposit is required. [*Id.*]. No other payment terms are included in the quote or were discussed at the time the deposit was paid, and no particular time frame for starting and completing the pole barn was established. On or about October 14, 2014, Plaintiff delivered to Defendant a certified check made payable to SR Services in the amount of $23,000.00. [*See* Pl. Exs. 9 & 10].

Defendant handled the financial accounts of SR Property Improvement Services LLC ("the LLC"), which included accounts at the Commodore Perry Federal Credit Union ("Credit Union"). The accounts consisted of two share draft accounts identified as sub-accounts 75 and 76, and a share master account identified as sub-account 99. [Pl. Ex. 24, Statement of Account as of 10/31/14]. The Credit Union account statements show Defendant as a co-owner of the accounts. [*Id.*, at p. 1/11 (sub-account 75), p. 10/11 (sub-account 76), p. 11/11 (master account 99)]. Defendant testified that the LLC does not have a credit card or

2

16-03068-maw    Doc 32    FILED 05/01/17    ENTERED 05/01/17 16:58:39    Page 2 of 15

credit line and all purchases are made by check, cash, or use of a debit card.

On October 15, 2014, Defendant deposited Plaintiff's $23,000.00 deposit in sub-account 76. [*Id.* at 10]. At approximately 9:30 p.m. that same day, Defendant transferred $20,000.00 from sub-account 76 to sub-account 99 and $9,000.00 from sub-account 75 to sub-account 99 via the internet. [*Id.* at 4 & 10]. Defendant credibly explained that he transferred funds from the two share draft sub-accounts to sub-account 99 after being notified that credit/debit cards used for purchases at Home Depot had been breached. Because he had made debit card purchases at Home Depot from sub-accounts 75 and 76, he transferred funds from those accounts to sub-account 99 until he could ensure that the cards had not been compromised. Thereafter, on October 17, 20, 22, 25 and 29, funds totaling $26,600.00 were either electronically transferred to sub-account 75 from sub-account 99 or withdrawn from sub-account 99 and redeposited into sub-account 75. [*Id.* at pp. 5-9, 11]. In addition, $800.00 was withdrawn on October 17 and $1,255.83 on October 27. The record does not show how that $2,055.83 was used. The court's review of the Statement of Account as of October 31, 2014, shows that sub-account 75 was used as the LLC's primary business expense account and was continued to be used throughout the month of October, thus requiring periodic deposits.

Work did not begin on the pole barn until mid-December 2014. The Margaretta Township zoning inspector informed Defendant that the largest pole barn he would approve would be a 50 x 40 foot pole barn and that he would not approve the 60 x 40 foot pole barn that Plaintiff wanted. Defendant informed Plaintiff that the pole barn would need to be smaller. Absent a two foot variance being granted to permit a 52 x 40 foot pole barn, new building plans would have had to have been developed. The zoning inspector ultimately allowed the variance and issued a zoning permit for a 52 x 40 foot pole barn.

Defendant then presented the plans for the pole barn to the county building department in order to obtain a building permit. The plans were not initially accepted due to a change in the Ohio building code in 2014 that requires an architectural engineer to submit plans for buildings greater than thirty-six feet wide. At a cost of $1,200.00, Defendant had an architectural design engineer create and register the pole barn building plans with the building inspector. A building permit was issued on December 18, 2014.

A crew of workers and subcontractors then began construction of the pole barn at Plaintiff's property. Plaintiff requested that the walls be lined with plywood, which was a change to the original plans and also required a change in the location of the door frame. The parties agreed to the change in plans at an additional cost of approximately $2,500.00.

Plaintiff testified that he became concerned when he observed the quality of the work being done.

3

According to Plaintiff, one of the trusses for supporting the roof was the wrong type of truss, which he reported to Defendant. In addition, Plaintiff testified that certain cuts were not made with the proper saw, leaving curved rather than flush edges, and certain parts of the structure were not properly fastened with nails or screws. According to Plaintiff, Defendant eventually stopped answering his telephone calls. Plaintiff then contacted an attorney. Work stopped on the pole barn. By that time, the pole barn framing was complete and the plywood walls installed.

At some point in time Plaintiff was contacted by Castalia Trenching, a subcontractor that claimed it had not been paid for work done at the job site. Castalia Trenching had been hired by the LLC to do certain grading, stone and drilling work. The court credits Defendant's testimony that it was paid for the grading and stone work done but not for the drilling, as the posts drilled by it had to be filled back in and Defendant had to rent equipment and pay to have them re-drilled.

On April 6, 2015, Defendant provided Plaintiff a break down of costs incurred on the project to date totaling $23,600.00, which included $8,928.00 in materials, $1,200.00 for the registered plans, $340.00 for permits, $5,870.00 for grading, stone, and drilling, and $7,262.00 for labor and equipment. [Pl. Ex. 4, p. 3]. The break down also provided that the total remaining cost to complete the pole barn was $18,955.00, which included remaining material costs of $7,595.00, labor costs of $5,880.00, and concrete and finish costs of $5,480.00. [*Id.*]. It indicates that the $2,688.39 difference from the original estimate reflects the creation of registered plans and the addition of the plywood walls. [*Id.*]. Defendant stated that to move forward, he needed an installment payment made for the remaining material costs. [*Id.*]. Up to that time, Defendant had not requested any additional funds from Plaintiff for the change in plans regarding the plywood lined walls. Plaintiff did not agree to make any further payments to Defendant, and no further work was done on the pole barn.

According to the county building inspector, no progress inspections of the pole barn had been done because no one had called to have them done. While Defendant concedes that it was ultimately his responsibility to do so, he was not on the job site on a daily basis and had a "lead" on site whose job it was to, among other things, call for an inspection at the proper times. In May 2015, Plaintiff called the building inspector and an inspection was completed in June or July 2015. The pole barn did not pass inspection because the footers, which are set underground and should have been inspected before proceeding with framing the pole barn, were no longer exposed. The inspector required that the footers be exposed for his inspection or that a design engineer stamp approval that they were installed correctly. In addition, the door frame was not placed in accordance with the building plans. According to Defendant, changing the

4

placement was a variation in the plans due to the plywood siding change requested by Plaintiff. While Defendant testified at trial that he does not feel that Plaintiff's pole barn was his best work, no other issues were noted by the building inspector.

In July 2015, contractor Chris Schaeffer contacted Plaintiff after noticing that work had stopped on the pole barn and to see if he needed help finishing it. Schaeffer testified that after looking at the pole barn, he believed it had to be torn down as it was not built properly. He provided Plaintiff a quote in the amount of $2,250.00, to take the pole barn down, which Schaeffer testified was based on the value of the pole barn materials that he could later use. [*See* Pl. Ex. 3, p.1]. Schaeffer also provided a quote in the amount of $31,360.00 to rebuild a pole barn. [*Id.* at 2]. On February 24, 2016, the Margaretta Township zoning inspector posted a Notice of Violation at Plaintiff's property due to "UN Completed Work to a Permitted Structure" and "Unsafe Standing Structure." [Pl. Ex. 17]. Schaeffer testified that he took the pole barn down, apparently at some time after February 24, 2016.

Plaintiff filed a civil action against Defendant in the Erie County, Ohio, Court of Common Pleas ("State Court Action"). On November 3, 2015, a judgment in the amount of $37,610.00 was entered against Defendant in the State Court Action.[2] Defendant testified that he received a copy of that judgment. After learning that Defendant owned real estate in Sandusky County, Ohio, Plaintiff caused a Certificate of Judgment to be filed in Sandusky County on December 10, 2015. On December 7, 2015, Defendant, together with co-owner Sherri J. Wilson, had transferred their residential real estate located in Vickery in Sandusky County to GR Holdings & Property Improvements, LLC ("GR Holdings") at a sale price of $5,690.00. [*See* Pl. Ex. 13 (property record for parcel no. 04-95-00-0080-00); Case No. 16-30782, Doc. #1, p. 14/84]. Defendant testified that their home is in very poor condition and has no heat and that he values it at between $5,000.00 and $7,000.00. The Sandusky County Property Record shows the taxable value of the property is $13,720.00. [Pl. Ex. 13]. Defendant testified that the property is now in his name and is included as an asset in his bankruptcy schedules.

Defendant filed his Chapter 7 bankruptcy petition on March 17, 2016. [Case No. 16-30782].

---

[2] Neither the state court complaint nor the judgment itself was made part of the record at trial. However, in his answer to Plaintiff's allegation in his adversary complaint that he obtained a judgment in the Erie County Court of Common Pleas against Defendant and the LLC, jointly and severally, in the amount of $37,610.00, Defendant admits that he "incorporated the judgment and the Civil case within the filing of his bankruptcy." [*See* Doc. # 1, ¶ 12; Doc. # 14, ¶ 12]. Plaintiff is scheduled as holding an unsecured claim in the amount of $37,610.00 on Defendant's bankruptcy Schedule E/F. [Case No. 16-30782, Doc. # 1, p. 30/84]. The court takes judicial notice of the contents of its case docket and Debtor's schedules. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

According to Defendant, two events occurred in early 2015 that caused his financial difficulties and led to him filing for bankruptcy relief. He testified that, first, an employee stole $29,000.00 from his company and second, a foreign property owner who had hired him to rehabilitate certain property failed to pay $45,000.00 that was due on completion of the job.

Plaintiff timely commenced this adversary proceeding, seeking a determination that Defendant owes him a non-dischargeable debt.

## LAW AND ANALYSIS

Plaintiff seeks a determination that a debt owed to him by Defendant in connection with the construction of the pole barn is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(4). A creditor must prove exceptions to dischargeability for individual debts under 11 U.S.C. § 523(a), including the exception for fraud, by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

### I. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services,. . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

For purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

In addition, the Supreme Court decided that § 523(a)(2)(A) also encompasses "actual fraud" as a separate standard for nondischargeability not requiring a misrepresentation. *Husky Int'l Elecs., Inc. v. Ritz,*

6

– U.S. –,136 S. Ct. 1581, 1587 (2016); *see also Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Rembert*, 141 F.3d at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

The preamble to § 523(a)(2)(A) states that the exception to discharge applies to any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" the specified misconduct. Defendant owes a debt to Plaintiff as determined by the state court, although Plaintiff's agreement for construction of the pole barn was with and the deposit was paid to the LLC. The Sixth Circuit Court of Appeals holds that a creditor's debt may fall within § 523(a) discharge exceptions by proving some direct or indirect tangible or intangible financial benefit to the debtor. *See Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996)("We therefore reject debtor's implication that a debt is nondischargeable under section 523(a)(2)(A) only when the creditor proves that the debtor directly and personally received every dollar lost by the creditor."); *cf. Cohen v. De La Cruz,* 523 U.S. 213, 218 (1998)("all liability arising from fraud" is nondischargeable). In *Brady*, a creditor successfully established a benefit to the debtor with proof that a corporation he controlled received $40,000 of the creditor's money. A third party may thus be the direct beneficiary of a fraud, but if a debtor is the perpetrator and obtains at least some indirect benefit, the debt owed to the injured party may be found to be nondischargeable. *Haney v. Copeland (In re Copeland),* 291 B.R. 740, 760-61 (Bankr. E.D. Tenn 2003).

After *Cohen* and perhaps also the Supreme Court's more recent decision in *Husky*, there is heightened uncertainty among courts whether "the benefit theory" of "obtained by" applied in *Brady* is a required element of proving a cause of action under § 523(a)(2)(A). *Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 728-29, n.14 (Bankr. N.D. Okla. 2007)(notes an issue post-*Cohen* whether the 'benefits theory" has been abrogated and thus no proof of benefit to the debtor is required to bring a debt within an exception to discharge); *First Am. Title Ins. Co. v. Speisman (In re Speisman)*, 495 B.R. 398, 403 (Bankr. N.D. Ill. 2013)(same). As the Sixth Circuit recently declined to do in *Leonard v. RDLG, LLC (In re Leonard)*, 644 Fed. Appx. 612, 618, 619 (6th Cir. Mar. 28, 2016), just before the Supreme Court decided *Husky,* this

7

court also need not decide whether "the benefit theory" of "obtained by" applied in *Brady* is a required element of a cause of action under § 523(a)(2)(A). The court finds that Defendant did obtain a financial benefit from Plaintiff's down payment deposited into the LLC's bank account. Defendant was a co-owner of, the principal of and controlled the LLC and its accounts. He is also a co-owner of the Credit Union accounts. On his April 6 e-mail to Plaintiff breaking down the project costs, Defendant describes himself in a signature block as the "General Partner/Director of Operations" of the LLC. [Pl. Ex. 4]. It provided his livelihood. The court finds that Plaintiff has presented sufficient facts, if necessary as a matter of law, to show that he conferred at least an indirect tangible financial benefit on Defendant within the Sixth Circuit's *Brady* analysis, warranting further consideration of whether the judgment debt owed by Defendant to Plaintiff arose from Defendant's own conduct of a kind proscribed by § 523(a)(2)(A).

The pole barn that Defendant agreed on behalf of the LLC to build for Plaintiff was never completed. While a mere breach of contract will not support a finding of fraud and nondischargeability, "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine),* 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000).[3] In other words, if Defendant as the perpetrator caused $23,000.00 to be taken from Plaintiff never intending to complete the pole barn project, he has knowingly made a false representation within the meaning of § 523(a)(2)(A). Plaintiff has identified, and the court finds, no other misrepresentation made by Defendant. The court thus addresses Defendant's intent to perform the project at the inception of the pole barn contract when the deposit was paid.

Plaintiff directs the court to evidence that Defendant transferred $20,000.00 of Plaintiff's $23,000.00 deposit from share draft sub-account 76 to the share master sub-account at the Credit Union and subsequent withdrawal of funds from the share master account, together with the fact that the pole barn was not even started until mid-December 2014, two months after Plaintiff's deposit was paid. According to Plaintiff, this evidence shows that Defendant used Plaintiff's deposit for something other than for construction of Plaintiff's pole barn and is evidence of Defendant's fraudulent intent from the inception of the contract. The court disagrees.

Initially, the court notes that there is no evidence of any particular agreed upon time line for beginning construction of the pole barn. And while the record is silent as to when Defendant actually began the process of applying for the required permits, Defendant credibly testified regarding delays in beginning

---

[3]In his dissent in *Husky,* Justice Thomas characterizes "a promise of future performance made with an intent not to perform" as a species of "actual fraud." 136 S. Ct. at 1593.

construction due to issues encountered by him in obtaining both a zoning permit and the building permit. Defendant's testimony was consistent with both the zoning inspector and the building official's testimony regarding the issues encountered in applying for the permits.

Plaintiff also places much emphasis on the fact that Defendant transferred most of Plaintiff's deposit from draft sub-account 76 at the Credit Union to the master sub-account and then withdrew most of the funds transferred during October 2014. Defendant credibly testified that $20,000.00 of the $23,000.00 deposit was transferred due to debit cards used at Home Depot having been potentially compromised. Both accounts were accounts held by the LLC, with Defendant as a co-owner. Except for two unexplained withdrawals totaling $2,055.83, which amount the court does not find significant, all of the withdrawals from the master sub-account were re-deposited throughout the month of October 2014 into draft sub-account 75, which appears to have been the LLC's primary business account. Plaintiff identifies, and the court's review of the October 2014 Statement of Account shows, no obviously unacceptable non-business use of those funds.

Defendant's breakdown of expenses relating to the pole barn construction as of April 6, 2015, shows that $23,600.00 had been expended. Except for Plaintiff's testimony that Castalia Trenching told him it had not been paid for work done at his property, there is no evidence that these itemized expenses are overstated. Expenses for the project were undoubtedly incurred, as the grading, stone and drilling work was necessary before starting construction and the pole barn was framed and the plywood siding was installed as was requested by Plaintiff. The court credits Defendant's testimony regarding not paying Castalia Trenching for drilling work that was unacceptable.

The court finds none of the evidence to which Plaintiff directs it persuasive as to Defendant's alleged fraudulent intent at the inception of the contract to build the pole barn. Absent a duty to segregate funds, which has not been shown in this case, money is fungible. *In re Sheridan*, 57 F.3d 627, 636 (7th Cir. 1995). Thus, even where a debtor does not use the specific funds provided by a creditor in the manner agreed upon, "the important question is whether the debtor made use of equivalent amounts of money in the required manner." *Id.* (addressing a claim under § 523(a)(2)(A)). Thus, whether Defendant did not use the specific $23,000.00 paid by Plaintiff for construction of the pole barn is immaterial as to Defendant's intent as he did direct use of more than equivalent funds for such purpose. *See Sullivan v. Glenn (In re Glenn)*, 502 B.R. 516, 540-41 (Bankr. N.D. Ill. 2013) (stating "[m]oney is fungible and it matters little that the exact money transferred by [the creditor] was not immediately used for the stated purposes" where funds were later used in the required manner).

9

The court finds more persuasive the fact that Defendant obtained the required permits, including paying an unanticipated $1,200.00 to have an architectural design engineer create and register the pole barn building plans with the building inspector, and caused the grading, drilling, and framing of the pole barn to be completed. In addition, Defendant caused the plywood siding on the pole barn to be installed, as was requested as a change in plans by Plaintiff and without asking for the additional funds the parties agreed upon to do so. The court finds such facts show that it is more likely than not that Defendant intended to build and complete the pole barn at the time he entered into the agreement to do so on behalf of the LLC. While Plaintiff was dissatisfied with the quality of the work, and the uncompleted shell was eventually torn down, the record fails to show that the resulting judgment debt owed by Defendant was for money obtained by "false pretenses, a false representation or actual fraud." 11 U.S.C. § 523(a)(2)(A).

In reaching this conclusion, the court has considered the United States Supreme Court's decision in *Husky*. Plaintiff offered no argument at trial in this regard. But it is unclear to the court whether he is nevertheless trying to bring this case within the ambit of *Husky* by offering evidence that Defendant transferred his interest in residential real estate to GR Holdings at a sale price of $5,690.00. The transfer occurred after Plaintiff had obtained the judgment against him in the State Court Action but before Plaintiff had filed the Certificate of Judgment in Defendant's county of residence.

In *Husky*, the Supreme Court decided whether the term "actual fraud" in § 523(a)(2)(A) requires a false representation or "whether it encompasses other traditional forms of fraud that can be accomplished without a false representation, such as a fraudulent conveyance of property made to evade payment to creditors." The court stated that the term "denotes any fraud that involves moral turpitude or intentional wrong" and "is broad enough to incorporate a fraudulent conveyance." *Id.* at 1586-87. The court explained:

> [T]he recipient of the transfer – who, with the requisite intent, also commits fraud– can "obtain" assets "by" his or her participation in the fraud. If that recipient later files for bankruptcy, any debts "traceable to " the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A).

*Id.* at 1589.

To start with, the court cannot find that Plaintiff has proven by a preponderance of the evidence an actually fraudulent transfer made with the actual intent to hinder, delay or defraud Plaintiff in collection of his judgment against Defendant. *See* Ohio Rev. Code § 1336.04(A)(1), (B). Under Ohio law, a judgment lien in real property arises from the time a certificate of judgment is recorded in a county where

a judgment debtor owns real property. Ohio Rev. Code § 2329.02; *Dietl v. Sipka*, 2009-Ohio-6225, ¶ 16, 185 Ohio App. 3d 218, 222 (2009). Also under Ohio law, a judgment lien does not attach to after-acquired property. *Bank of Ohio v. Lawrence*, 161 Ohio St. 543, 547 (1954). When the Certificate of Judgment issued to Plaintiff was recorded on December 10, 2015, in Sandusky County, where the Vickery, Ohio residential real estate is located, Defendant had already quit-claimed his interest in the property to GR Holdings on December 7, 2015. As a matter of Ohio law Plaintiff's judgment lien did not attach to the Vickery real property, either at recording of the Certificate of Judgment or when the property was conveyed back to Defendant and became after-acquired property. The timing of the transfers raise an obvious suspicion of fraudulent intent and an effort to thwart Plaintiff's recovery. There is no evidence in the record, however, from which the court can infer that Defendant was familiar with these finer points of Ohio collection law such that this was his intended outcome in participating in the transfers of the real property to GR Holdings and back.

Lacking direct evidence of fraudulent intent, fraudulent intent under Ohio Revised Code § 1336.04(A)(1) is generally determined by applying the so-called eleven "badges of fraud" listed in §1336.04(B). That the initial transfer to GR Holdings occurred after Defendant had been sued and after a substantial debt had been incurred, as a judgment of which Defendant was aware had been obtained, are factors relating to timing that are listed in the statute as indicative of fraudulent intent. Ohio Rev. Code § 1336.04(B)(4) and (10). But Plaintiff has not addressed application of Ohio Revised Code § 1336.04(A)(1) and the list of factors determinative of fraudulent intent under Ohio Rev. Code § 1336.04(B). Beyond the timing of Defendant's initial transfer, the only other factor upon which the evidence points to actual intent to hinder or delay is that Defendant apparently retained possession and control of the property after it was deeded to GR Holdings. Ohio Rev. Code § 1336.04(B)(2). There is either no evidence in the trial record as to the other factors (Ohio Rev. Code § 1336.04(B)(5), (6), (7), (9), (11)) or the evidence favors a finding of lack of intent – (Ohio Rev. Code § 1336.04(B)(1)[transferee GR Holdings not shown to be owned by Defendant or an insider; *see* Pl. Ex. 6 ]; (Ohio Rev. Code § 1336.04(B)(3) [deed to GR Holdings recorded in public records as shown by Pl. Ex. 13]; and (Ohio Rev. Code § 1336.04(B)(8) [consideration of $5,690 agreed to for the transfer as shown by Pl. Ex. 13, which is not unreasonably small based on Defendant's testimony about the condition of the property]. On balance the court cannot find that the transfers or either of them were made with the intent to hinder, delay or defraud Plaintiff.

Indeed the transfer of the real property back to Defendant eliminated the need for any statutory remedies in Plaintiff's favor. *See* Ohio Rev. Code § 1336.07. Moreover, Plaintiff has not shown any actual

injury arising from the transfers of Defendant's interest in the Vickery property to GR Holdings and back. Unlike the business property transfers at issue in *Husky,* the transfers in this case involve Defendant's home. At the time of the transfer to GR Holdings, Defendant was entitled to a homestead exemption against judgment creditors in the amount of $132,900.00, *see* Ohio Rev. Code § 2329.66(A)(1)(b) (effective April 1, 2013 through March 31, 2016), which far exceeds both Defendant's valuation and the Sandusky County Auditor's valuation of the property. Had Defendant not transferred the real estate and had Plaintiff's judgment lien attached to the property, Defendant would have been entitled to claim the full value of his interest in the property as exempt, a fact that also blunts potential fraudulent intent. Defendant would have been able to avoid the judgment lien in its entirety in his underlying Chapter 7 case under §522(f) of the Bankruptcy Code.[4]

But even if Plaintiff successfully proved that Defendant transferred his interest in the Vickery real estate to GR Holdings with fraudulent intent, *Husky* does not make the judgment debt nondischargeable under § 523(a)(2)(A). The evidence is that all of the conduct surrounding the real property transfers in this case occurred after the judgment against Defendant in the State Court Action was entered. Any injury (albeit none shown) arising from the alleged fraudulent transfer(s) could not have given rise to the judgment debt at issue. Although taking an arguably more expansive view of § 523(a)(2), the Supreme Court in *Husky* did not actually eliminate the "obtained by" requirement of the statute. Unlike Defendant, the individual debtor in *Husky* was not liable on the original trade debt, and his liability to the creditor arose if at all through a scheme of fraudulent transfers he caused the original corporate obligor to make. Indeed the Supreme Court in *Husky* remanded the case for further proceedings on the "obtained by" requirement in § 523(a)(2). *Husky*, 136 S. Ct. at 1589, n. 3.[5] And while *Husky* in dicta may open the door wide for § 523(a)(2) claims against debtor-transferees who have received fraudulently transferred assets, *see* Deborah

---

[4] Section 522(f) provides that a debtor "may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is . . . a judicial lien. . . ." 11 U.S.C. § 522(f)(1)(A).

[5] The Fifth Circuit Court of Appeals issued an opinion on remand. *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560 (5th Cir. 2016). It sent the case back to the district court for remand back to the bankruptcy court for a determinations as to whether Ritz is liable under a Texas veil piercing statute as a threshold question because, if Ritz is not liable under Texas law, then he owes no debt to Husky. The opinion does not address the "obtained by" issue. The bankruptcy court issued its decision on remand on April 19, 2017, finding that (1) Ritz owes a debt to Husky under the Texas veil piercing statute based on actually fraudulent transfers initiated by Ritz as proscribed under the Texas Uniform Fraudulent Transfer Act; (2) Ritz's actual fraud personally benefitted him; and (3) Ritz's resulting personal liability to Husky is non-dischargeable under § 523(a)(2)(A). *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, –B.R.–, 2017 WL 1417265 (Bankr. S.D. Tex., April 19, 2017). The detailed facts on remand in finding a debt owed by Ritz to Husky obtained by actual fraud as a result of a scheme of fraudulent transfers nondischargeable under § 523(a)(2)(A) contrast sharply with the facts in this case.

12

Thorne & Brett Newman, *What's Next After Husky v. Ritz: Has Pandora's Box Been Opened?*, 35 Am. Bank. Inst. J. 20 (2016), Defendant here is the alleged transferor of his own property. *Husky*, 136 S. Ct. at 1589 ("It is of course true that the transferor does not 'obtain' debts in a fraudulent conveyance."); *see also McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000)(pre-*Husky* case in which the court determined that a transferee who knowingly colluded on an actually fraudulent transfer incurred a separate non-dischargeable debt to the transferor's creditor). Like other courts, *e.g., BancorpSouth Bank v. Shahid (In re Shahid)*, Case No. 15-30868-HAC, Adv. Pro. No. 16-03009, 2016 Bankr. LEXIS 3889, *6-*8 (Bankr. N.D. Fla. Nov. 3, 2016), this court will not extend the *Husky* dicta and find that a debt "obtained by" Defendant's participation on a shoddily performed and ultimately uncompleted contractual obligation and then reduced to judgment can somehow be "re-obtained" and rendered nondischargeable by later alleged fraudulent conduct. *Walker v. Vanwinkle (In re Vanwinkle)*, 562 B.R. 671, 677-78 (Bankr. E.D. Ky. 2016)(judgment debt for contract damages not rendered non-dischargeable by allegedly fraudulent scheme to frustrate collection efforts).

Nor does the evidence of the post-judgment real estate transfers in this case more generally support an inference of Defendant's fraudulent intent and course of conduct stretching back over the life of the parties' pole barn transaction. If the evidence around Defendant's transfer of his interest in his residential real estate to GR Holdings were contemporaneous with performance of the contract, the record might paint a different picture of an overarching scheme within the broader standard of actual fraud under *Husky* and *Vitanovich* even in the absence of a specific fraudulent statement. Those are not the facts of this case. *Cf. Husky*, 136 S. Ct. at 1591 (Thomas, J., dissent)(Justice Thomas asserts that § 523(a)(2)(A) applies only when the fraudulent conduct occurs at the inception of the debt, *i.e.* when the debtor commits a fraudulent act to induce the creditor to part with his money, a position apparently rejected by the majority).

The $ 37,610.00 debt represented by the state court judgment was not "obtained by" fraud -- whether a course of action or fraudulent statement rendering it non-dischargeable under § 523(a)(2)(A). Even if the "obtained by" fraud requirement was expanded in *Husky*, where the debtor's potential liability arose not from the original trade debt but if at all from his asset transfer scheme, the judgment debt in this case that Plaintiff seeks to have declared non-dischargeable does not meet that standard. No other separate debt or theory of damages arising from the alleged fraudulent transfers has been advanced and proven in

13

this case and § 523(a)(2) does not establish an independent basis for a claim, *Vanwinkle*, 562 B.R. at 678.[6]

## II.  11 U.S.C. § 524(a)(4)

In his complaint, Plaintiff also alleges that Defendant owes him a debt that is nondischargeable under § 523(a)(4), which provides that a discharge under 11 U.S.C. § 727 does not discharge an individual from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Specifically, Plaintiff alleges that Defendant's transfer of his residential real estate to GR Holdings and the subsequent transfer of that property back to Defendant "was an act of fraud and defalcation while acting in a fiduciary capacity for Plaintiff and in violation of the fiduciary duty owed by Defendant to Plaintiff." [Doc. # 1, ¶ 32].

Whether a party acted in a "fiduciary capacity" for purposes of § 523(a)(4) is determined by federal, not state law. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir.2005). The Sixth Circuit construes "fiduciary capacity" as used in § 523(a)(4) more narrowly than the term is used in other circumstances. *Id.* In order to trigger the fraud or defalcation provision in that statute, a debtor must hold funds in a trust for the benefit of a third party. *Id.* (citing *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997)). Furthermore, the types of trusts that will trigger the fraud or defalcation provision of § 523(a)(4) are "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id*.

While the existence of a fiduciary relationship for purposes of § 523(a)(4) is determined by federal law, *Blaszak,* 397 F.3d at 390, the determination of whether an express or technical trust exists is governed by state law, *Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 702 (Bankr. S.D. Ohio 2000); *see Capitol Indemnity. Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir.1985). In order to establish the existence of an express trust, a plaintiff must demonstrate (1) an intent to create a trust, (2) a trustee, (3) a trust res, and (4) a definite beneficiary. *Blaszak,* 397 F.3d at 391; *see*

---

[6]Courts agree that, under certain circumstances, "'a fraudulent transfer based on an actual intent to hinder, delay or defraud a creditor can support a [Bankruptcy Code] § 523(a)(6) claim.'" *Cordeiro v. Kirwan (In re Kirwan)*, 558 B.R. 9, 13 (Bankr. D. Mass. 2016)(quoting *In re Jahring*, 510 B.R. 820, 829 (Bankr. N.D. Ill. 2014) and citing *Husky,* 136 S. Ct. at 1588, and other cases); *McClellan*, 217 F.3d 1t 896 (Ripple, J., concurring)(§ 523(a)(6) "provides a far more direct avenue for dealing with" fraudulent transfers than § 523(a)(2)). But Plaintiff has not asserted in his complaint any claim for non-dischargeability under § 523(a)(6) on the basis of a willful and malicious injury. Even had Plaintiff asserted a claim under § 523(a)(6), he has failed to prove that Debtor had actual intent to hinder, delay or defraud, as explained above, with the intent of causing a willful and malicious injury to Plaintiff or his property. The judgment debt suffers from the same disconnect under § 523(a)(6) as it does under § 523(a)(2). *Steier v. Best (In re Best)*, 109 Fed. Appx.1 (6th Cir. 2004)(efforts to thwart collection of a judgment debt do not render it nondischargeable under § 523(a)(6) because they did not give rise to the debt); *Kirwan*, 558 B.R. at 13-14("[I]t cannot be said that the injury created by Mr. Kirwan's hindering the ability to collect on their state court judgments gave rise to the judgments themselves.").

14

*Ulmer v. Fulton*, 129 Ohio St. 323, 339–340 (1935).

At trial, Plaintiff offered no testimony or argument that the pole barn contract created an express trust. The parties' contract required Plaintiff to pay a $23,000.00 deposit and describes the work to be done for Plaintiff at a total cost of $39,266.61. Nothing in the contract indicates that the parties intended to create a trust, and no evidence or testimony at trial indicates anything more than a contractual relationship. While a statute may create a technical trust, *see Ronk v. Maresh (In re Maresh)*, 277 B.R. 339, 350 (Bankr. N.D. Ohio 2001) (setting forth the requirements of a technical trust), Plaintiff has identified, and the court is aware of, no Ohio statute creating such a trust under the circumstances in this case. Without the creation of an express or technical trust, no fiduciary relationship exists for purposes of § 523(a)(4).

## **CONCLUSION**

Plaintiff having failed to satisfy his burden of proof under § 523(a)(2)(A) and (a)(4), Defendant is entitled to judgment in his favor on the complaint. The court will enter a separate judgment in accordance with this Memorandum of Decision.

###